IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
February 26, 2002 Session

## JERRY BRITT v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Hamblen County**
**No. 97-CR-213     James Edward Beckner, Judge**

**No. E2001-00864-CCA-R3-PC**
**September 26, 2002**

The Petitioner was charged with one count of aggravated sexual battery; five counts of rape of a child; two counts of possession with intent to sell or deliver a controlled substance; and six counts of the delivery of a controlled substance. The Petitioner subsequently pled guilty to two counts of possession with intent to sell or deliver a controlled substance and to six counts of the delivery of a controlled substance. He also entered an Alford plea to three counts of attempted rape of a child. Pursuant to his plea agreement, the trial court sentenced the Petitioner to an effective sentence of forty-eight years. The Petitioner subsequently filed a timely petition for post-conviction relief which was heard and denied by the trial court. In this post-conviction appeal, the Petitioner contends that he received ineffective assistance of counsel when he entered his pleas; that his counsel's deficient performance rendered his guilty pleas unknowing and involuntary; and that he should be granted post-conviction relief because of newly discovered evidence. Concluding that the Petitioner received adequate representation when he entered his plea; that his pleas were entered knowingly, voluntarily, and intelligently; and that the Petitioner is not entitled to post-conviction relief on the basis of newly discovered evidence, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JERRY L. SMITH and JAMES CURWOOD WITT, JR., JJ., joined.

P. Richard Talley and S. Douglas Drinnon, Dandridge, Tennessee, for the appellant, Jerry Britt.

Paul G. Summers, Attorney General and Reporter; Elizabeth B. Marney, Assistant Attorney General; C. Berkeley Bell, Jr., District Attorney General; and Christopher Scruggs, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

I.  PROCEDURAL HISTORY

On July 1, 1996, the Hamblen County Grand Jury charged the Petitioner, Jerry Elmer Britt, in an eight count presentment with one count of aggravated sexual battery; five counts of rape of a child; one count of possession with intent to sell or deliver a Schedule II controlled substance; and one count of possession with intent to sell or deliver a Schedule IV controlled substance. On the same date, the Hamblen County Grand Jury also charged the Petitioner in a separate presentment with six counts of the delivery of a Schedule II controlled substance.

On November 19, 1996, pursuant to a plea agreement, the Petitioner pleaded guilty to one count of possession with intent to sell a Schedule II controlled substance and to one count of possession with intent to sell or deliver a Schedule IV controlled substance. The Petitioner also entered an Alford plea to three counts of attempted rape of a child. See generally North Carolina v. Alford, 400 U.S. 25 (1970). Additionally, the Petitioner pleaded guilty to the six counts of the delivery of a Schedule II controlled substance that were the subject of a separate presentment.

Pursuant to the Petitioner's plea agreement, the trial court sentenced the Petitioner as a Range I, standard offender to twelve years incarceration for each conviction for attempted rape of a child; to six years incarceration for possession with intent to sell a Schedule II controlled substance; to four years incarceration for possession with intent to sell or deliver a Schedule IV controlled substance; and to six years incarceration for each conviction for the delivery of a Schedule II controlled substance. The court ordered that the three sentences for attempted rape of a child run concurrently with each other, and concurrently with the sentences for possession with intent to sell a Schedule II controlled substance and for possession with intent to sell or deliver a Schedule IV controlled substance. The court ordered that each of the six sentences for the delivery of a Schedule II controlled substance run consecutively to each other and consecutively to the effective sentence of twelve years for the three attempted rape of a child convictions and the other drug convictions. The Petitioner thus received concurrent effective sentences of twelve years followed by six consecutive sentences of six years each, for a total effective sentence of forty-eight years.

The following events then took place, as summarized by this Court in a prior opinion:

On August 26, 1997, petitioner filed a pro se petition for post-conviction relief. On August 28 the District Public Defender was appointed to represent the appellant. The matter was set for hearing November 14. The affidavit of Edward H. Moody, assistant public defender, reflects that by letter dated October 27, 1997, appellant requested an enlargement of time, or, if necessary, the right to dismiss and refile his petition. By order dated November 5, 1997, the court dismissed the petition without prejudice to a timely refiling.

On November 10, 1997, petitioner filed a new pro se petition for post-conviction relief. On February 9, 1998, the trial court entered an order appointing the District Public Defender to represent the defendant.

On March 5, 1998, defendant wrote a letter to his counsel purporting to discharge him from further representation. On March 20, 1998, the trial court relieved the District Public Defender from further representation. By order dated March 30, 1998, reflecting a hearing date of March 27, the court dismissed the

petition without appointing alternate counsel and without conducting a hearing. The order reflects, however, that the court did consider the petition for post-conviction relief, the answer of the State, and the transcript of the guilty plea hearing of November 19, 1996.

Jerry E. Britt v. State, No. 03C01-9806-CR-00208, 1999 Tenn. Crim. App. LEXIS 567, at **2-4 (Tenn. Crim. App., Knoxville, June 4, 1999) (citation omitted). The Petitioner appealed the dismissal of his petition for post-conviction relief, and on appeal, this Court concluded that the Petitioner "should have new counsel appointed and should be given an evidentiary hearing." Id. at *7. This Court therefore reversed the judgment of the trial court and remanded the case to the trial court for further proceedings. See id.

Pursuant to the order of this Court, the trial court conducted an evidentiary hearing on March 16, 2001. At the conclusion of the hearing, the trial court again denied post-conviction relief. It is from this denial of relief that the Petitioner now appeals. He presents three arguments for our review: The Petitioner first argues that he was denied his right to effective assistance of counsel at his guilty plea proceedings. He next argues that his ineffective representation rendered his plea involuntary and unknowing. Finally, the Petitioner contends that he is entitled to relief from his guilty pleas on the basis of newly discovered evidence. Having reviewed the record in this case, we affirm the judgment of the trial court.

## II. EVIDENCE PRESENTED AT THE POST-CONVICTION HEARING

The following evidence was presented at the evidentiary hearing on the Petitioner's petition for post-conviction relief. The Petitioner's attorney testified that at the time of the hearing, he was serving as County Executive of Hawkins County, but that prior to his service in this capacity, he practiced criminal defense and personal injury law for forty-one years. He also stated that he was employed as a District Attorney General for seventeen years.

Counsel testified that he had lost his file concerning the Petitioner's case and that he believed that the Petitioner's case had been dismissed. He therefore testified solely from his memory of the case. Counsel reported that he was retained by the Petitioner to represent him on charges of five counts of rape of a child, one count of sexual battery, and two counts of possession of drugs with intent to sell. Counsel stated that at the time he was retained to represent the Petitioner, the Petitioner was facing a potential sentence of twenty-five years to be served at one hundred percent for each of the rape of a child charges. He also stated that the Petitioner was facing "probably . . . two or three consecutive sentences" for child rape. He testified that two other attorneys in his office also worked on the Petitioner's case and helped him investigate "lead[s]" in the case.

Counsel stated that during his first meeting with the Petitioner, he discussed with the Petitioner the type of investigation that he would be required to perform in order to defend against a rape case. Counsel recalled that he investigated an alleged prior allegation by the victim of the child rape charges that her natural father had sexually abused her. However, counsel testified that he found nothing to indicate that such an allegation was ever made. Counsel reported that he

-3-

nonetheless filed a Rule 412 motion to "establish . . . [the victim's] prior sexual behavior." Counsel stated that he also investigated allegations that the victim of the child rape charges had engaged in sexual relations with two juvenile males. He testified that an investigator whom he hired contacted the males, but was unable to confirm the allegations. Finally, he stated that another attorney in his office investigated allegations that the victim told three girls in her class at school that the Petitioner had stabbed her with a butcher knife, but counsel was unable to recall whether the attorney in his office actually contacted the girls. Counsel reported that he kept the Petitioner apprised of his investigation of the case.

Counsel testified that he spoke with the victim's mother "numerous times" while preparing the case, and he stated that because of his contact with the victim's mother, he was able to have "two child rapes dismissed, . . . a sexual assault dismissed, and [that he was able to obtain] a plea reducing three rape charges to an attempt, and concurrent sentences of twelve years." Counsel stated that he never spoke with the victim in this case. He could not recall whether he asked to speak to the victim, but was refused access to her. Although he could not clearly recall, he believed that the victim's mother did not want him to speak to the victim. He acknowledged that the State spoke with the victim in preparing the case, but he maintained that the victim was "being very difficult" with the attorney general who prepared the case for the State. Furthermore, according to counsel, the victim's mother "questioned . . . her daughter's veracity." Counsel reported that the victim's mother told him that during a juvenile court hearing, the victim made statements that could be interpreted as a recantation of her accusations against the Petitioner. Counsel testified that the victim's mother more specifically told him that the victim "made the statement that nothing happened." However, counsel testified that the victim's mother "never told [him] that her daughter was going . . . to recant," and he stated that he later learned that the victim did not recant. Counsel maintained that he informed the Petitioner of every conversation that counsel had with the victim's mother.

Counsel further testified that he reviewed the victim's medical records, and he reported that he discussed every aspect of the medical records with the Petitioner. Included in the records was a statement by a physician who examined the victim. According to counsel, this physician would have testified that it was possible that the victim could have engaged in sexual intercourse with an adult male. Counsel testified that he filed a motion based on a doctor's statement, stating, "I was . . . hoping to show that [the Petitioner] was not the only person that the [victim] had allegedly had sex with." However, counsel admitted that he did not speak to the physician or nurse who examined the victim. In addition, counsel testified that he learned, probably from the Petitioner himself, that the victim was a carrier of Hepatitis C. To the best of counsel's recollection, no DNA evidence connected the Petitioner to the crimes in this case.

Counsel also recalled that the victim's medical records indicated that she had made conflicting statements to doctors and to Department of Human Services employees. He testified that the victim "wasn't the most truthful witness." Counsel reported that he was ultimately unable to ascertain whether the victim would have testified against the Petitioner at trial, but he stated that the victim's mother told him that the victim planned to testify regarding the statements that she had made. Counsel admitted, "There was a lot of information . . . to cross examine [the victim] on," and

he reported that he was prepared to cross-examine the victim regarding her conflicting statements. He also reported that the Petitioner was aware of the statements.

Counsel testified that a telephone conversation between the victim and the Petitioner had been audiotaped and that the State read into evidence a transcript of the taped telephone conversation at the guilty plea proceeding. Counsel stated that although some portions of the tape were inaudible, other portions could be understood. During the conversation, the victim asked the Petitioner, "Remember when you and me had sex, you know, could you have shot that stuff up in me?" According to the State, the Petitioner answered, "Uh-huh," the victim then asked, "You could?" and the Petitioner again answered, "Uh-huh." The actual transcript of the conversation, which is included in the record, indicates that the Petitioner responded, "Huh-uh" to both questions. However, counsel maintained that the Petitioner actually answered, "Huh, not huh-uh, but huh" to both questions. He explained that he believed other discrepancies existed between a transcript of the taped conversation made by his office and that made by the court reporter. He stated, "[W]hat we could hear on the tape was a bit different than what the court reporter . . . heard . . . ." Counsel maintained, however, that his "impression of the audiotape was that it was very damaging." He therefore filed a motion to suppress the tape, which the trial court denied.

Counsel testified that in his statement to police, the Petitioner admitted that he had been in bed nude with the victim when she was eleven or twelve years old. Counsel clarified, however, that the Petitioner did not actually confess to the crimes charged. Counsel reported that he discussed this statement with the Petitioner.

With regard to the drug charges against the Petitioner, counsel testified that he was never informed that any of the drugs had been planted in the Petitioner's apartment. Counsel testified that based on the evidence against the Petitioner, he believed the State "had a lock on" the Petitioner with regard to the drug charges. Counsel also stated that he was "much more concerned about the five charges of child rape."

Counsel reported that based upon all of the aforementioned evidence, he recommended that the Petitioner accept a plea agreement of forty-eight years to be served at thirty percent. He stated that otherwise, the Petitioner was facing a sentence of twenty-five to seventy-five years to be served at one hundred percent. He testified that the trial judge informed the Petitioner that the Tennessee Department of Correction typically requires an inmate to serve one hundred percent of a conviction for attempted rape of a child, and he reported that he informed the Petitioner that "if he were convicted of child rape, there was no opportunity for parole." Counsel testified that he discussed these possibilities "a number of times" with the Petitioner. Counsel denied that the State ever made an offer of fifteen years "flat" for the charges, but he recalled that at the request of the Petitioner, he suggested a fifteen-year offer to the State before he and the Petitioner became aware of the drug charges. He maintained that if the Petitioner had received a fifteen-year offer, he and the Petitioner "would have taken it and run with it." He explained the negotiated forty-eight-year sentence as follows: "The magic of that number was that I had offered fifteen years. And if you compute forty-eight years at thirty percent, you get fourteen years and four months. Now, that would be, as I

computed and what I told him, that's the first time that he would be eligible." He also stated, "[A]s I calculated, [the Petitioner] could've been out in the fourteen point four years, or he could serve . . . forty-eight years. And [the Petitioner] understood."

District Attorney General Charles Berkeley Bell, Jr., acted on behalf of the State in preparing this case against the Petitioner. He testified that he initially offered the Petitioner "fifteen years day-for-day for the rapes" and offered for all charges, including the drug charges, to run concurrently. Bell reported that counsel for the Petitioner counter-offered a sentence of forty-eight years, to be served at thirty percent.

The victim of the attempted rape of a child charges also testified at the post-conviction hearing. She stated that at the time of the hearing, she was seventeen years old and that at the time of the crimes, she was twelve years old. She testified that in 1996, she alleged that she and the Petitioner had engaged in sexual intercourse on more than one occasion. She reported that neither counsel for the Petitioner nor any lawyer employed by counsel interviewed her about the allegations. The victim maintained that if counsel had interviewed her, she would have told him "the truth. . . . [t]hat nothing had ever happened." She stated that by this, she meant that she never engaged in sexual intercourse with the Petitioner. The victim explained, "It's going to sound crazy, but I was jealous, because [the Petitioner] was getting all the attention from my mom. And I was sitting here thinking, and I thought, Maybe I can do something about it, and make him go to jail, and I could get all her attention; she'd be focused on me and nobody else." The victim admitted that she had slept in a bed with her mother and the Petitioner, but denied that any sexual contact occurred. In addition, the victim admitted that she had alleged that her father had sexually abused her while she was with him in Oregon, but she maintained that the allegations concerning her father were true. She testified that the allegations against her father "got her back to Tennessee with [her] mom," and she stated that she "figured if [she said] that again, [she] could get what [she] wanted like [she] did before." The victim also maintained that had she been called to testify at the Petitioner's trial, she would have testified that she and the Petitioner did not engage in sexual intercourse.

On cross-examination, the victim testified that she made the tape-recorded telephone call to the Petitioner because she "was trying to confuse him, trick him into saying what he did . . . ." She claimed that she told a doctor and a detective who questioned her about the case that she had not had sexual intercourse with the Petitioner. She could not recall whether she reported this information before or after the Petitioner became incarcerated.

The Petitioner testified that he retained his attorney in late February or early March of 1996 and that his attorney represented him until he entered his plea in November 1996. He stated that he never met the other two attorneys who helped his counsel with the case. The Petitioner reported that he agreed to pay his attorney $30,000, which was secured by a lien against his property.

The Petitioner complained that his counsel did not fully discuss his case with him and did not adequately investigate his case. He stated that he met with counsel several times prior to entering his plea. The Petitioner testified that shortly after he hired counsel, he took the victim's

mother to counsel's office so that she could convey information to the attorney to help in the investigation of the Petitioner's case. With regard to the investigation of his case, the Petitioner stated that his attorney should have interviewed three of the victim's friends at school, that counsel should have contacted at least one person in Oregon concerning prior allegations made by the victim, and that he should have hired a "professional" to analyze the audiotape of his conversation with the victim. The Petitioner also stated that counsel should have discussed with him the content of the audiotape and the content of the transcript of the tape.

The Petitioner stated that he became incarcerated in July 1996 and remained incarcerated until he entered his plea. The Petitioner stated that approximately two weeks after he became incarcerated, his attorney gave him his entire file and told him that the State had offered him a fifteen-year sentence with all charges running concurrently. According to the Petitioner, the State made the offer in exchange for a guilty plea to the rape of a child charges and to all other drug charges. The Petitioner claimed that he refused the offer, stating that he was willing to plead guilty to all drug charges in exchange for a fifteen-year sentence if the rape of a child charges were dismissed. The Petitioner testified that he assumed he and his attorney were preparing to go to trial after he refused the offer.

The Petitioner testified that on the Friday before his scheduled trial date, his attorney visited him and said, "I've got a hell of a deal for you. . . . They'll drop the rape of a child and enter in a best interest plea of attempted rape, and give you a sentence of forty-eight years at thirty percent." The Petitioner maintained that his attorney told him this deal was better than an offer of fifteen years "flat," but did not tell the Petitioner a date when he might be released if he accepted the offer. The Petitioner recalled that counsel then evaluated the evidence for his case and recommended that the Petitioner accept the offer. According to the Petitioner, counsel's recommendation was based on statements made by the victim and on transcripts made of the taped telephone conversation between the Petitioner and the victim. The Petitioner stated that his attorney told him that the victim would testify that she was sexually penetrated by the Petitioner when she was twelve years old. The Petitioner further testified that his attorney told him that "the tape alone would . . . absolutely kill [him] in trial" and that they "didn't have a . . . slim chance to none of winning that case." The Petitioner maintained that at the time his counsel made the recommendation, he did not mention the statement that the Petitioner had made to police.

The Petitioner testified that he understood that the offer conveyed to him by his counsel included an Alford plea to three counts of attempted rape of a child and to two drug possession counts. See generally North Carolina v. Alford, 400 U.S. 25 (1970). However, he complained that he instead entered an Alford plea to only the three attempted rape of a child charges. See id. The Petitioner reported that the Alford plea was important to him because he was not guilty of the crimes charged. See id.

The Petitioner insisted that his attorney's recommendation to accept the forty-eight year offer was improper. He maintained that he had never engaged in sexual intercourse with the victim and stated that he had evidence which would have proved him innocent at trial. When questioned about

this evidence, the Petitioner specified that the discrepancies between the audiotape of his conversation with the victim and the transcript of the tape pointed towards his innocence. He also testified that he had learned that if the victim had been called to testify at trial, the victim would have denied sexual conduct with him. Finally, he testified that he could have explained his statement to police as follows:

> I have a one-room apartment . . . . There's only one bed in the apartment. . . . [The victim] stayed there about two months. . . . And during those two months there was [sic] times that I would go to bed before [she and her mother] did. So if I was in bed, I'm sure that [the victim] would come in there; but I was covered up. I was never uncovered.

The Petitioner testified that he had reviewed the transcript of his telephone conversation with the victim. He stated that certain portions of the transcript did not "match up" to the audiotape. He also claimed that he did not say some of the words credited to him in the transcript. He reported that his attorney played the audiotape for him, but did not discuss the transcript with him. The Petitioner testified that because he did not see the transcript prior to his plea, he was not aware of discrepancies between the audiotape and the transcript at the time he entered his plea.

The Petitioner admitted that he told the trial court at his guilty plea proceeding that he was satisfied with his representation. However, he explained that he became dissatisfied with his representation after the proceeding when he reviewed evidence for his case, including the transcript of his conversation with the victim and his case file which, according to the Petitioner, indicated that his attorney had failed to interview certain witnesses. The Petitioner also stated that his plea was voluntary "based on what [he] knew." However, he maintained that he would not have pled guilty had he been fully informed.

On cross-examination, the Petitioner testified that before he entered his plea, he was aware that the victim had "changed her story," but maintained that prior to his plea, the victim did not reveal that she had not engaged in sexual intercourse with the Petitioner. He also admitted that prior to his plea, he did not examine any of the evidence provided him by his attorney and instead gave the evidence to his brother. He explained, "[I] was paying [my attorney] thirty thousand dollars to do the job. And, . . . like he said, he's [had] forty years experience [as] an attorney. I didn't see any reason for me to go over it, because I knew . . . what I wanted to do, and that was to go to trial." The Petitioner acknowledged that the trial court told him at the time of his plea that he may be required to serve one-hundred percent of his sentence for the attempted rape of a child charges. Finally, when asked whether he understood the meaning of "forty-eight years at thirty percent," the Petitioner responded, "It meant a better deal than fifteen at a hundred percent."

## I. ANALYSIS

## A. INEFFECTIVE ASSISTANCE OF COUNSEL

The Petitioner first contends that he is entitled to relief because he received ineffective assistance of counsel. Specifically, he complains that his attorney failed to properly investigate his case; failed to interview "key witnesses," including the victim; and failed to adequately communicate with him. More specifically, he claims that counsel erred by failing to interview the victim's classmates concerning allegations made by the victim; by failing to interview medical personnel who examined the victim; by failing to properly investigate allegations by the victim against her biological father; and by failing to discuss with the Petitioner discrepancies between the audiotaped conversation between the Petitioner and the victim and transcripts subsequently made of the conversation. He also argues that counsel "misassessed the State's case, [the Petitioner's] defenses and the likelihood of consecutive sentences . . . and misadvised [the Petitioner] regarding the plea arrangement and his release date."

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. Tenn. Code Ann. § 40-30-203. The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. Id. § 40-30-210(f). A post-conviction court's factual findings are subject to a de novo review by this Court; however, we must accord these factual findings a presumption of correctness, which is overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely de novo review by this Court, with no presumption of correctness. Id. at 457. The Tennessee Supreme Court has held that the issue of ineffective assistance of counsel is a mixed question of law and fact and, as such, is subject to de novo review. State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999).

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and Article I, Section 9 of the Tennessee Constitution. Id.; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). This right to representation includes the right to "reasonably effective" assistance. Burns, 6 S.W.3d at 461. In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. Baxter, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness," Strickland v. Washington, 466 U.S. 668, 688 (1984), and that this performance prejudiced the defense, resulting in a failure to produce a reliable result. Id. at 687; Cooper v. State, 849 S.W.2d 744, 747 (Tenn. 1993). To satisfy the requirement of prejudice, a petitioner must show a reasonable probability that, but for counsel's unreasonable error, the fact finder would have had reasonable doubt regarding the petitioner's guilt. Strickland, 466 U.S. at 695. This reasonable probability must be "sufficient to undermine confidence in the outcome." Id. at 694; see also Harris v. State, 875 S.W.2d 662, 665 (Tenn. 1994).

This standard also applies to claims arising out of the plea process. Hill v. Lockhart, 474 U.S. 52, 58 (1985). To satisfy the requirement of prejudice in a case involving a guilty plea, the

petitioner must demonstrate a reasonable probability that, but for counsel's errors, he or she "would not have pleaded guilty and would have insisted on going to trial." Id. at 59.

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. Strickland, 466 U.S. at 690; State v. Mitchell, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. Strickland, 466 U.S. at 690; Cooper, 849 S.W.2d at 746; Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Burns, 6 S.W.3d at 462. Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. Williams v. State, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980).

At the post-conviction proceeding, the trial court made the following findings of fact:
[L]et me begin by saying that [counsel] . . . has been one of the very best criminal lawyers in the state of Tennessee, criminal defense lawyers. . . .

The credible evidence is, that [counsel] employed a great number of resources in investigating the case. This Court's experience is, that [counsel] did not plead the cases easily. Over the years with him trying the cases for defendants in this court, probably had more jury trials from the clients that he's represented than any others, so – [i]t . . . always has been . . . hard to get [counsel] to the podium for a plea. He tried cases and . . . often won the cases. Had a great rate of success in trying cases when he practiced law.

In this particular case, which is what is important, all the evidence indicates that [counsel] had numerous conferences with the petitioner; that he investigated the case thoroughly; that he filed all motions that seemed to be appropriate to be filed or were called for under the facts and circumstances of the case; that he almost surreptitiously, but not unethically, had a mole, in effect, in the District Attorney General's Office telling him everything that was going on and the discussions with the victim.

It's rare in a child rape case for a defense counsel to have an opportunity to talk to a victim. The Supreme Court has said that the victim does not have to talk to the defense counsel. And ordinarily that is the choice that the victim makes.

From everything that I've heard in this case, that seems to be the choice that was made either by the victim herself, or her mother on her behalf. And if that choice was made by her mother on her behalf, you have to take into consideration the fact that her mother seemed to, at all times, be trying to support, defend the petitioner in the charges against him.

No court reviewing this case would look at the case and . . . decide that . . . [counsel] did not do a fair investigation; that he did not try to discover all witnesses, and all about the witnesses; all incriminating evidence. He fully obtained discovery.

It's easy to look at any one aspect, or even all aspects of the investigation, the

attempt by a defense lawyer to ferret out evidence; the decisions that have to be made about the evidence; what impact it would have, and conclude that there is some inconsistency somewhere, or inconsistencies everywhere - - that a wrong decision was made at some point about some evidence, how to use it.

But you have to look at the totality of the circumstances and decide whether the tactics of the lawyer in the end were appropriate tactics; whether any different results would have occurred had other tactics been used; other decisions been made.

There are always conflicts in the evidence in the case. There are always conflicts in the witness's testimony. This Court has been trying cases for twenty-five years, and has yet to see a case where any witness's testimony was perfect, unimpeachable in any respect. That's just not the way lawsuits work. . . .

The only conclusion I can reach about [counsel], first, is that he did leave no stone unturned; that he investigated every aspect of the case and made his decisions based upon the plea negotiations, or based upon evidence from which a jury could have convicted the petitioner of the principal charges.

With regard to the victim's testimony at the post-conviction hearing, the trial court made the following findings:

It's said . . . by the victim today, that she would have testified that the petitioner did not have any sexual contact with her had she testified at the trial several years ago. How can you believe or give credit to what is testified to today, based upon the record? Her statements back then were inconsistent. She had said back then, at some point, that the petitioner had not done what he was charged of doing. As a matter of fact, in the allocution it was brought out that she had said on some occasions, or on occasion that he had not done the things he was charged with doing.

Finally, the trial court made the following findings concerning the Petitioner's plea hearing and counsel's recommendation to the Petitioner to accept the plea agreement:

The allocution is pretty clear. It covers over thirty-one pages. This Court was very careful with this allocution because of the nature of the charges and the circumstances. Because there was some question about the ability of the victim to testify, or what she would testify to.

But throughout . . . the transcript of the allocution of the guilty plea, the petitioner here, the defendant then, assured this Court that he understood all the matters, the consequences, the complications, the consequences of entering such a plea, and all his constitutional rights , whether his lawyer had done everything that he expected him to do. And the Court was assured that he understood everything.

This Court had an opportunity to observe the petitioner at that time, and there was certainly nothing to cause this Court to believe that . . . there was anything mentally wrong with him, or physically that would cause him not to understand the questions. As a matter of fact, the allocution shows that the petitioner was a very

articulate person, very intelligent person, someone who had no difficulty understanding those things.

So it really comes down to this. Given all the ability; the investigation; the thoroughness of representation; the allocution; the seeming ability to understand anything and everything; the fact that everything, really, in fact, was known then that is known now, and there is nothing new in the case, was it still, and in spite of that, such a travesty of justice as to require some action? Were judgements just so totally devoid of understanding that it can't be condoned? Had they gone to trial again, there was that huge risk of many times the sentence that was ultimately imposed. Petitioner could have been impeached with prior criminal convictions. This Court has tried many of these cases over many years. I think the odds were probably very strong for a conviction in this case instead of an acquittal. Although anything can happen including acquittal.

Those were the circumstances . . . under which [counsel] recommended the plea for the petitioner.

The evidence does not preponderate against these findings by the trial court. With regard to his preparation for the case, counsel testified at the post-conviction hearing that he, two attorneys from his office, and an investigator whom he hired all participated in the investigation of the Petitioner's case. Counsel testified that he met with the Petitioner and with the victim's mother, who was apparently cooperative with the defense, several times while preparing the case, and the Petitioner acknowledged that he met with his attorney several times before entering his plea. Although the Petitioner now contends that his attorney erred by failing to interview the victim of the rape of a child charges, the trial court found that the choice not to participate in an interview with counsel was made by either the victim or by the victim's mother on her behalf. We also note that "Tennessee case law, moreover, gives a prospective witness the discretion to talk -- or not to talk -- to either counsel, as the witness sees fit." State v. Singleton, 853 S.W.2d 490, 493 (Tenn. 1993). Furthermore, although the victim testified at the post-conviction hearing that had she been called to testify at the Petitioner's trial, she would have denied sexual contact with the Petitioner, the trial court discredited this testimony by the victim. In doing so, the trial court pointed out that the victim made inconsistent statements prior to the Petitioner's plea proceeding.

With regard to the Petitioner's complaint that his attorney erroneously advised him concerning his plea agreement and the amount of time that he would be required to serve under the agreement, the trial court found as follows:

The minimum on each one of those five child rape cases, from fifteen up to a maximum of twenty-five years, since it's a Class A felony. I believe it was in effect then that you start at the midrange. So you would probably start . . . at twenty years, a hundred percent on any one conviction, instead of fifteen. And then . . . under the statute, child rape cases are sentencable consecutively. So, I guess, it's conceivable that you . . . could've had five twenty-five years stacked. So, that's the kind of exposure the petitioner had with . . . the statement that he made with the tape, even

-12-

though there are inconsistencies with the . . . proposed testimony of the victim in this case.

Not a lot has been said about the drug cases, really except for the letter. And it does appear that the state had a very strong, strong case in there. It's a roll of the dice in these cases. It could go any way. But, certainly, a jury could have found the petitioner guilty of the child rape cases.

The court also stated,

I can't say whether a fifteen-year flat plea is better than a forty-eight year sentence with a thirty percent release eligibility date, which carries eligibility with it at fourteen point four years. But I think I can safely say that had the representation been different, not much has been . . . specifically presented to offer what exactly should've been done, instead of what was done. It's mostly a focus on what wasn't done exactly as well as it should have been.

The Petitioner now complains that his sentence is longer than that initially offered by the State during plea agreement negotiation. However, the Petitioner unequivocally testified at the post-conviction hearing that he flatly refused the State's initial fifteen-year offer because he simply would not accept any offer which required him to plead guilty to the offense of rape of a child. Furthermore, we note that as a Range I, standard offender, the Petitioner was potentially facing sentences of twenty-five years for each of the five counts of rape of a child. See Tenn. Code Ann. §§ 39-13-522(b), 40-35-112(a)(1). Pursuant to Tennessee Code Annotated § 40-35-115(b)(5), the trial court could have ordered these sentences to be served consecutively.

Further, it is well settled that a defendant's guilty plea is not rendered involuntary simply because the exact date of his possible release is not known by the defendant. Jerome Lamont Wolley v. State, No. 01C01-9311-CR-0042, 1994 Tenn. Crim. App. LEXIS 709 (Tenn. Crim. App., Nashville, Oct. 20, 1994). "Although the actual length of confinement is an important consequence of the voluntariness calculus, it is the stated term of incarceration at the sentencing and the formula for its calculation that are the direct consequences which warrant actual knowledge on the part of Appellant." Id. at *9.

The Petitioner also complains that counsel erroneously recommended that he accept consecutive sentences for six counts of delivery of a controlled substance. In support of his argument, he relies upon State v. Richard Lynn Norton, No. E1999-00878-CCA-R3-CD, 2000 Tenn. Crim. App. LEXIS 637 (Tenn. Crim. App., Knoxville, Aug. 22, 2000). In Norton, this Court emphasized that a sentence must relate to the seriousness of the offense and concluded that the imposition of consecutive sentences for three controlled drug buys "permit[ted] investigating officers to dictate the length of a sentence based upon the number of controlled buys they arranged and the amounts purchased." Id. at *27. This Court thus modified defendant Norton's sentence, requiring him to serve two, rather than three, consecutive sentences for his crimes. Id. at *28. Had the Petitioner in this case been sentenced by the trial court to consecutive sentences for the six drug charges, he would have had a strong argument on appeal that consecutive sentences were improperly

imposed in his case. The Defendant also relies upon State v. John Derrick Martin, No. 01C01-9502-CR-00043, 1995 Crim. App. LEXIS 984 (Tenn. Crim. App., Nashville, Dec. 19, 1995), in which this Court modified an effective sentence of forty years for four drug offenses to twenty years, stating that the consecutive sentences ordered by the trial court were not reasonably related to the severity of the four crimes involved. However, this case is distinguishable from Norton and Martin in that it involves a negotiated plea agreement. The Petitioner's counsel in this case was not prohibited from negotiating consecutive sentences for the Petitioner's crimes.

We thus conclude that the Petitioner was not denied his right to effective assistance of counsel. The trial court found, and we agree, that the Petitioner's attorney adequately investigated the Petitioner's case, that counsel adequately communicated with the Petitioner, and that the Petitioner's plea agreement was proper. We find no deficiency in the Petitioner's representation. Moreover, even assuming that the Petitioner received inadequate representation, we are unconvinced, especially considering the severity of the charges and the lengthy possible sentences that the Petitioner would have faced upon conviction, that but for error by counsel, the Petitioner would have proceeded to trial.

## B. VALIDITY OF PETITIONER'S PLEA

The Petitioner next contends that his counsel's deficient performance rendered his plea unknowing and involuntary. In order to satisfy constitutional standards, a plea of guilt must be entered knowingly, voluntarily and intelligently. See Boykin v. Alabama, 395 U.S. 238, 243 (1969). This includes an intentional relinquishment or abandonment of known constitutional rights, including the right against compulsory self-incrimination, the right to confront witnesses, and the right to a trial by jury. Bates v. State, 973 S.W.2d 615, 624 (Tenn. Crim. App. 1997). "'[T]he standard was and remains whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.'" Powers v. State, 942 S.W.2d 551, 556 (Tenn. Crim. App. 1996) (quoting Alford, 400 U.S. at 31). "When a competent petitioner knowingly and voluntarily chooses a lawful course of action or defense strategy, counsel is essentially bound by that decision." Zagorski v. State, 983 S.W.2d 654, 658-59 (Tenn. 1998).

In determining whether the petitioner's guilty pleas were knowing and voluntary, this Court must look at the totality of the circumstances. State v. Turner, 919 S.W.2d 346, 353 (Tenn. Crim. App. 1995); Chamberlain v. State, 815 S.W.2d 534, 542 (Tenn. Crim. App. 1990). In doing so, we may review any relevant evidence in the record, including the post-conviction proceedings. Turner, 919 S.W.2d at 353.

> [A] court charged with determining whether [the] pleas were "voluntary" and "intelligent" must look to various circumstantial factors, such as the relative intelligence of the defendant; the degree of his familiarity with criminal proceedings; whether he was represented by competent counsel and had the opportunity to confer with counsel about the options available to him; the extent of advice from counsel and the court concerning the charges against him; and the reasons for his decision to

plead guilty, including a desire to avoid a greater penalty that might result from a jury
trial.

Blankenship v. State, 858 S.W.2d 897, 904 (Tenn. 1993).

As previously stated, we conclude that the Petitioner received the effective assistance of
counsel, and therefore we conclude that the Petitioner was adequately informed when he entered his
plea.  Not only did counsel inform the Petitioner of potential pitfalls were he to proceed to trial, but
the trial court also informed the Petitioner at the plea proceeding that "if [he pled] guilty to the
attempt to commit rape of a child [charges], [he] probably [would be required] to serve most of that
sentence without being released on [the] release eligibility date."  At the conclusion of the post-
conviction hearing, the trial court found that the Petitioner received effective assistance of counsel
and that he therefore entered his plea knowingly, voluntarily, and intelligently.  The evidence
contained in the record before us does not preponderate against that finding.

## C.  NEWLY DISCOVERED EVIDENCE

Finally, the Petitioner contends that he is entitled to post-conviction relief on the basis of
newly discovered evidence that the victim recanted the allegations against him.  However, as the
State correctly points out, newly discovered evidence is not generally an appropriate ground for relief
under the Post-Conviction Procedure Act.  See William H. Necessary, Jr., v. State, No. 03C01-9601-
CC-00009, 1999 Tenn. Crim. App. LEXIS 246, at **17-18 (Tenn. Crim. App., Knoxville, Mar. 16,
1999); Randy Hicks v. State, No. 03C01-9608-CR-00296, 1998 Tenn. Crim. App. LEXIS 253 at
**8-9 (Tenn. Crim. App., Knoxville, Mar. 3, 1998).  More specifically, this Court has held that
"recanted testimony amounts to no more than a request to relitigate the sufficiency of the evidence
at trial and is not a proper subject of post-conviction relief."  Teresa Deion Smith Harris v. State, No.
W2000-02611-CCA-R3-PC, 2001 Tenn. Crim. App. LEXIS 604, at *3 (Tenn. Crim. App., Jackson,
June 13, 2001).

Furthermore, as previously noted, the trial court discredited the victim's recantation at the
post-conviction hearing.  The trial court also made the following findings concerning the victim's
recantation:

> [Counsel], in discussing the evidence, said that he asked [the] prosecutor if . . . the
> victim . . . had retracted [the allegations against the Petitioner].  And his testimony
> was: When I was having that transcribed, . . . [the victim] had made the statement
> that she lied.  That it did not happen.
>
>    . . . .
>
> It's just not newly discovered evidence.  All of the things about her testimony,
> or potential testimony back then were known at this time.  Nothing new has been
> discovered now. . . . When she . . . changed her mind and testified differently on
> several occasions about different things, [she] put everybody on notice . . . that her
> testimony could be anything from very strong for conviction, to exoneration. But that
> was not a chance that anybody wanted to take.

We agree with these findings by the trial court.

## IV.  CONCLUSION

We conclude that the Petitioner received effective assistance of counsel and that he entered his pleas knowingly, voluntarily, and intelligently.  We further conclude that the Petitioner is not entitled to post-conviction relief on the basis of newly discovered evidence.  Accordingly, we AFFIRM the judgment of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE